FILED

2012 Sep-30  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **TERRI FRANKS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. 7:08-CV-1035-SLB** |
| | } | |
| **INDIAN RIVERS MENTAL** | } | |
| **HEALTH CENTER,** | } | |
| | } | |
| **Defendant.** | } | |

### MEMORANDUM OPINION

This case is currently before the court on plaintiff Terri Franks's ("Franks") Motion in Limine to Exclude Exhibits Summarizing Unproduced Evidence, (doc. 31), defendant Indian Rivers Mental Health Center's ("Indian Rivers") Motion to Strike Plaintiff's Affidavit, (doc. 42), and defendant's Motion for Summary Judgment, (doc. 34). Upon consideration of the record, the submissions of the parties, the relevant law, and arguments of counsel, the court is of the opinion that Franks's Motion in Limine, (doc. 31), is due to be granted, Indian Rivers' Motion to Strike Plaintiff's Affidavit, (doc. 42), is due to be granted in part and denied in part, and Indian Rivers' Motion for Summary Judgment, (doc. 34), is due to be granted in part and denied in part.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor.  *See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every *reasonable* inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)) (emphasis added).

## II. FACTUAL AND PROCEDURAL HISTORY

Franks has sued her former employer, Indian Rivers, alleging Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, HIPPA / invasion of privacy, negligent hiring, training, supervision, and retention, and intentional infliction of emotional distress causes of action, (*see generally* doc. 1),[1] arising out of actions taken by Indian Rivers before and during her FMLA leave and the termination of her employment by Indian Rivers immediately following her return from FMLA leave.  (*See generally id.*)[2]

Indian Rivers is a non-profit, quasi-governmental agency that provides mental health and mental retardation services for individuals in Tuscaloosa, Bibb, and Pickens Counties, Alabama.  (IRB, Ex. B at 19 & 21.)  Franks, who has a Master's Degree in community counseling, a Bachelor's Degree in psychology, and is a licensed professional counselor, was

---

[1]  The negligent hiring, training, supervision, and retention, and intentional infliction of emotional distress causes of action set forth in Counts Three and Four of the Complaint, respectively, are due to be dismissed pursuant to Franks's request, (*see* doc. 38 at 34).

[2]The facts are taken from the briefs, (docs. 35, 39, & 43), and evidentiary submissions, (Indian Rivers' Brief In Supp. [hereinafter "IRB"], Exs. A-H & Franks's Response in Opp. [hereinafter "FRO"], Exs. 1-12), filed in support of, and opposition to, Indian Rivers Motion for Summary Judgment.  Exhibit A to the Scheduling Order states that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment."  (Doc. 13-1 at 4 (emphasis omitted).)  Consequently, the facts offered by Indian Rivers and not controverted by Franks, and likewise, the facts offered by Franks and not controverted by Indian Rivers, are deemed admitted. As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to Franks, the nonmovant.  Although the evidence in conflict on issues of fact is set forth herein, all disputed facts are ultimately resolved in Franks's favor, and all reasonable inferences arising from those facts are drawn in her favor.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

3

hired by Indian Rivers in 1993.  (FRO, Ex. 1 ¶ 2.)  Franks worked in many areas of Indian Rivers from 1993-1997.  In 1997, she became the Adult Outpatient Program (the "AOP") Coordinator at Indian Rivers.  (*Id.*)  In 2006, Franks applied for the newly created position of AOP Manager and was deemed an outstanding candidate.  (FRO, Ex. 10 at exs. 13, 14, & 15.)  In March of 2006, Franks was promoted to AOP Manager.  (FRO, Ex. 1 ¶ 2; doc. 1 ¶ 12.)  As the AOP Manager, one of Franks's main responsibilities was overseeing Treatment Plan Reviews ("TPR") for Indian Rivers' patients.  (IRB, Ex. A at 43.)  Franks, as Manager of the AOP, was also responsible for intake assessment, probate matters, the Crisis Response Team and Substance Abuse Services, group and individual therapy, crisis intervention, mental retardation services, and the Case Management Program.  (IRB, Ex. A at 37-48 & 54-56; FRO, Ex. 1 ¶ 3.)

The TPR is a process established by the State Department of Mental Health and by Medicaid whereby a certified reviewer reviews a treatment plan on a set schedule.  Medicaid and residential patients are reviewed every 90 days, while self pay and private insurance patients are reviewed once a year.  (IRB, Ex. A at 43, 56-57, 59-60, & 93.)  Only a certified reviewer with proper credentials may sign TPRs.  (IRB, Ex. A at 55 & 68; IRB, Ex. C at 56-57.)  However, the primary reviewer of the treatment plan need not be licensed and could be the therapist treating the patient or the person overseeing their treatment.  The secondary reviewer that checks the primary reviewers work is required to be a licensed professional.  (IRB, Ex. A at 55 & 67-68.)  To complete a TPR, the reviewer must pull the patient's chart

or file, review the treatment plan and notes or other documentation in the record to determine whether the services had been provided and to determine the patient's response to the services, whether the patient had been compliant, whether the patient had made progress, and whether that level of service should be continued.  (IRB, Ex. A at 44-46 & 57-58.)  A TPR aims to certify that (1) the treatment set out in a patient's treatment plan is medically necessary; (2) the goals, objectives, and interventions remain appropriate; (3) the documentation in the file accurately reflects the treatment being provided; and (4) that continued treatment is recommended.  (IRB, Ex. A at 52-58, 91, & ex. 14.)

Franks is familiar with Medicaid guidelines and TPRs.  (IRB, Ex. A at 47.)  She knew the importance of proper and timely documentation in TPRs.  (IRB, Ex. A at 76-90; *see* IRB, Ex. A at ex. 2.)  She led a review of the forms process, developed the TPR form used by Indian Rivers, and trained other staff members on treatment plans and TPRs.  (IRB, Ex. A at 44-46 & 58.)  Franks reviewed the TPRs in the AOP because she was a licensed professional counselor.  (IRB, Ex. A at 55-56 & 92.)  For the TPRs she reviewed, Franks was responsible for making sure that everything contained in the TPR was correct and properly documented and in compliance with all federal and state requirements.  (IRB, Ex. A at 68.)  Franks, however, had no control over the employees in the file room and those employees' ability to file all medical records timely and correctly.  Specifically, notes and other information necessary to complete a TPR and make the required determination were frequently missing from the file, misfiled, or still in the doctor's office.  (IRB, Ex. A at 104-

07, 117-18, 133-38, 143, 151, 164, 170-72, 180-81, 190-91, 194-98, 208, & 217; IRB, Ex.

C at 181-82; FRO, Ex. 10 at ex. 41.)  Consequently, the information available to the TPR

reviewer was often compromised.  (IRB, Ex. A at 104-07, 117-18, 133-38, 143, 151, 164,

170-72, 180-81, 190-91, 194-98, 208, & 217; IRB, Ex. B at 243-44; IRB, Ex. C at 52, 217-

19, & 188-90; FRO, Ex. 9 at 39.)

On March 20, 2006, shortly after Franks was promoted to the AOP Manager position,

Connie Robbins ("Robbins"), the Clinical Director at Indian Rivers, asked Franks to create

a system to monitor quality issues for the AOP, including record reviews, which

encompassed TPRs.  (IRB, Ex. A at 102-03 & ex. 6; IRB, Ex. E.)  Robbins told Franks that

Franks needed to develop a system for reviewing TPRs with due dates to ensure that Indian

Rivers was in compliance with all federal and state requirements.  (IRB, Ex. E.)  Indian

Rivers contends that Franks initiated a system to review TPRs and implemented that system

in May and June of 2006, but did not follow through when the reviews were due to be

performed in August and September of 2006.  (Doc. 34 at 4 (citing IRB, Ex. E).)  Indian

Rivers also contends that because Franks was behind with her TPRs and had not yet

implemented an effective monitoring system, Robbins met with Plaintiff and addressed this

again in her performance evaluation in November or December of 2006.  (Doc. 34 at 4

(citing IRB, Ex. A at 111 & 113; IRB, Ex. C at 75; IRB, Ex. E).)  However, there is evidence

that Franks did follow through with the TPR monitoring system.  (FRO, Ex. 10 at ex. 41;

IRB, Ex. A at 105-09; FRO, Ex. 4 ¶ 3.)  After Franks was promoted to AOP Manager and

worked under Robbins for a year, Robbins scored Franks higher than the year before on her

yearly evaluation in November 2006.  (FRO, Ex. 10 at ex. 12; IRB, Ex. C at 210.)  Robbins

did not record any issue with Franks TPR performance on Franks's yearly evaluation in

November 2006.  (FRO, Ex. 10 at ex. 12.)  In March 2007, Robbins openly praised Franks,

Brittany Blackston, and Lisa Geist for their work in implementing an effective TPR system.

(FRO, Ex. 4 ¶ 3.)

In October of 2006, Franks experienced medical problems as a result of two herniated

discs in her neck.  (Doc. 39-1 ¶ 4; IRB, Ex. A at 213.)  Franks was having difficulty

functioning due to her neck problems.  (Doc. 39-1 ¶ 4; IRB, Ex. A at 213.)  Franks informed

Robbins that she needed to have surgery on her neck within the next few months.  (Doc. 39-1

¶ 4; IRB, Ex. A at 213.)  Robbins became openly and obviously panicked.  (Doc. 39-1 ¶ 4.)

Robbins told Franks that there was a lot of work to do and that Indian Rivers could not afford

to have Franks off work until after an audit by the Alabama Department of Mental Health

and Mental Retardation.  (*Id.*)  Franks told Robbins that she had put the surgery off for five

years and would put off going into the hospital for as long as she could, but that she was in

pain and was having difficulty functioning.  (*Id.*; IRB, Ex. A at 213.)

After Franks informed Robbins about the FMLA leave she needed to take in October

of 2006,  Robbins began having problems with Franks's performance and began increasing

her responsibilities and assigning her an inordinate amount of work to complete.  (*Id.* ¶ 5.)

For instance, before Franks told Robbins of her need for surgery, Franks was responsible for

conducting eight hundred to nine hundred TPRs for her department; thereafter, Robbins assigned Franks all of Indian Rivers' TPRs, which was approximately five thousand in January 2007.  (*Id.*)  In addition, Franks was seeing eight to ten patients in therapy a day.  (*Id.*)  Franks was also the primary therapist at Indian Rivers' Pickens County Office; Indian Rivers did not fill her previous position when she was promoted to AOP manager in March of 2006.  (*Id.*)  Franks was also responsible for training Indian Rivers' entire staff on a new treatment model it was developing.  (*Id.*)  In that capacity, Franks was charged with training all staff on how to write clinical notes to obtain proper reimbursement for medically necessary services, developing all of the new computer generated treatment forms, placing them on the computers in the entire center, and training new staff in how to use the computer generated forms.  (*Id.*)

In November or December 2006, Robbins prepared a typed list of all TPRs that she gave to Franks to be her documentation system on conducting TPRs for the months of January, February, and March 2007.  (IRB, Ex. A at 113-18; IRB, Ex. C at 212 & 214.)  Robbins instructed Franks to use the list correctly, completing TPRs every ninety days for clients, deleting clients when their cases were closed, and adding new clients to the list.  (IRB, Ex. C at 214-216.)  This list, however, was incomplete and needed constant updating.  (IRB, Ex. A at 122, 143-45, & 149-51; IRB, Ex. C at 217-18; FRO, Ex. 10 at ex. 42; FRO, Ex. 1 ¶ 14.)  Franks had her staff work on a more complete and comprehensive list after a full review of all patient files had been located.  (IRB, Ex. A at 105-08, 151, & 198; FRO,

Exs. 1-3.)  On December 11, 2006, Robbins gave Franks a new priority list during a managers' meeting, which identified areas in which Franks needed to work.  The priority list set Franks's goals for developing a plan to complete TPRs and to insure follow-through of the TPR system then in place for the year 2007.  (IRB, Ex. A at 115-18; IRB, Ex. A at exs. 7 & 9; IRB, Ex. C at 74-75; IRB, Ex. E.)

In March and April of 2007, Robbins learned from the Medical Records Coordinator that numerous TPRs were in the Medical Records Department waiting to be signed by Franks.  (IRB, Ex. E.)  Thereafter, on April 4, 2007, Robbins met with Franks and gave her a memorandum (the "Robbins Memorandum"), which outlined problems with Franks's performance.  (IRB, Ex. A at 124 -41; IRB, Ex. A at ex. 11.)  The Robbins Memo states, in relevant in part:

> For the second time now in less than a year, the updating of AOP TPRs has became a crisis. Last summer this occurred because there was no follow-through with the system you had established utilizing Task Needs. This failure not only resulted in a payback of greater than $40,000,[3] but it also meant a huge amount of time was required of numerous others to remedy the situation. My greatest concern about that incident is that I was the one who identified the problem and initiated the correction. Surely you recognized the significance of this based on the emphasis I placed on correcting it, making it a priority for several months until there was some assurance that the system was re-established.
>
> Now, again, the whole process has broken down. Rather than taking what had been set up so that TPRs could be managed in an organized manner, you again are in a crisis situation, requiring multiple others to spend their time trying to get a grasp on this problem. This is unacceptable.

---

[3]Indian Rivers omitted this sentence from the version of the April 4, 2007 memorandum set forth in its Statement of Undisputed facts.  (*See* doc. 34 at 5-6.)

While the above identifies a very huge problem, it is just one example of a bigger concern. I believe that you know what has to be done to manage the AOP. However, what I see is that you are unable to monitor and maintain working systems within your programs. Instead, you stay in a pattern of crisis response. This has been evident in situations with Misha and even with SA. Rather than staying on top of the issues in each program, they are not monitored closely enough until they move into a crisis status. I suspect a similar thing happened with Pickens County. Once you respond to this crisis, you are then unable to follow through on commitments and responsibilities. On many occasions you have promised completion of tasks, but been unable to do so due to these crisis distractions. This has severely impaired your credibility with me and others.

It is imperative at this time that you determine what the priorities are within your programs. It will be beneficial for you (and required by me) to outline these priorities, identifying the goals, the steps necessary to accomplish, a timeline of completion, and the system you will implement to monitor and evaluate. You are going to have to make some immediate changes in your role as manager. You are to be the person directing others to perform in a consistent, organized manner. You can't do this unless you are able to complete your assignments in such a manner.

(FRO, Ex. 10 at ex. 40; IRB, Ex. A at ex. 11.)

Robbins wrote the Robbins Memorandum after receiving a separate memorandum dated March 30, 2007, from an unknown source, which outlined problems with Franks's performance as the AOP Manager. (FRO, Ex. 10, ex. 43 at bates 1129.) Robbins could not recall who gave her the memorandum dated March 30, 2007. (IRB, Ex. C at 141-44.) The Robbins Memorandum mirrored the memorandum from the unknown source dated March 30, 2007, in several respects. As noted, the Robbins Memorandum attributed the cause of a more than forty thousand dollar ($40,000.00) Medicaid payback to Franks. Rita Harless ("Harless"), Indian Rivers' Human Resources Director, also testified that she was aware of

the alleged Medicaid payback caused by Franks.  Harless testified that this payback impacted the budget of Indian Rivers, including raises to employees.  (IRB, Ex. D at 165.)  Jim Moore ("Moore"), Indian Rivers' Executive Director, testified that "no one single issue ... has had that much of an impact on ... raises or bonuses."  (IRB, Ex. C at 247-48.)  Nothing in the record confirms the existence of a payback to Medicaid of ($40,000.00) attributable to Franks.  At his deposition Moore produced documentation that Indian Rivers paid back twelve thousand eight hundred twenty dollars and seventy cents ($12,820.70) to Medicaid. (IRB, Ex. B at 74-76.)  Robbins testified that she came up with the forty thousand dollar ($40,000.00) figure based on an estimate she received from Tammy Blackerby and the billing office at Indian Rivers.  (IRB, Ex. C at 37-38.)  However, neither the Chief Financial Officer, Betty Jones ("Jones"), nor the Accountant, Tammy Blackerby ("Blackerby"), had any knowledge of the alleged Medicaid payback.  (FRO, Ex. 8 at 75-80; FRO, Ex. 7 at 17-20 & 26-27.)  Blackerby testified that she never provided Moore or Robbins with any amount for Medicaid pay backs and was never asked to do so.  (FRO, Ex. 8 at 75-76, 79-80, & 83-84.) Similarly, Jones testified that she was not aware of any Medicaid payback and had never provided any amount to Moore or Robbins.  (FRO, Ex. 7 at 18-19 & 54-56.)  Indian Rivers did not produce any documentary evidence of any amount being paid back to Medicaid due to Franks or any error caused by her.  (*See* docs. 34 & 43.)  Nonetheless, Robbins represented to the personnel board that such a payback was made when Franks filed a grievance to get her job back following termination.  (FRO, Ex. 10 at ex. 52 at bates 0357 & exs. 53-55.)

On April 11, 2007, Franks responded to the Robbins Memorandum.  Indian Rivers contends that in the response memorandum of April 11, 2007, Franks admitted that she had not implemented an effective system for ensuring timely TPR completion.  Franks response memorandum, however, states in part:

> After receiving your memo about concerns you have about my performance as a manager, I took a few days to reflect on your current position on how things are going in the programs for which I am responsible.
>
> The first problem I want to address is the treatment plan reviews. You and I covered this issue in my performance appraisal. At the time of the appraisal, nothing was mentioned of the $40,000.00 for which you have named me as the sole reason this occurred.  I have already taken responsibility for trying to complete all of the treatment plan reviews on my own last summer in previous discussions. As far as discovering the problem, it was a team effort in the Adult Outpatient Unit. Not long after Jan Cobb left, we all began to discover that Jan had missed several reviews through human error. In addition, we realized that several of our clients had Medicaid that AR had failed to communicate to us. Simply put, we have a broken system on many levels. Outside of the Medicaid reviews, we have our yearly reviews. I have tried to get those done on my own but have not had time. I have been able to utilize Brittani and Lisa to review records and close cases. They have been a big help to all of us. They have reviewed nearly every record at the VA and at Pickens County with the exception of a few charts that cannot be located. I had expressed my concern about these yearly reviews several times; however, Medicaid charts have been the only priority. They may have gotten a little bit a ahead and gotten the list out of order; however, we now have the most comprehensive list of cases, their payer sources with actual clients than ever before. I for one am grateful for that amazing accomplishment especially with our site review coming up.
>
> In terms of my operating in a 'crisis response' mode each day, the adult program at the VA is for the most part, the outpatient emergency department for the mentally ill. Our front desk staff is essentially our triage staff. To make matters worse, we are down to one full time doctor, one part time doctor who threatens to quit almost every time he is here, and one doctor I am praying will continue in the counties. In short, when we have to

12

worry each day about how to get medicine to our clients because we may or
may not have a doctor, we are very much in a crisis.

As far as the other issues you mentioned, i.e. Misha, Pickens, and SA, I am
not as clear about why you are not happy. I did not have control over Misha
breaking a Federal law and breeching ethical guidelines. That was clearly a
decision she made on her own. I did not have control over hiring a
convicted felon and moved to terminate him as soon as I saw that he was
acting in a way that was unethical and that placed the agency at risk.
Additionally, it is my understanding that Dr. Donahue is very happy with
how things are going in Pickens County. It would be helpful for you to
explain your concerns about Pickens County in more detail. It is also my
understanding that things are going well in Substance Abuse and it would
be helpful for you to explain your concerns about that program as well.

> . . .

Treatment Plan Reviews

You recently explained that the Medicaid report is run twice per month. I
will expect a copy of these reports twice each month beginning in May. I
will not be held responsible for Medicaid paybacks based on TPRs if it is
due to someone getting that benefit and I am simply not told. I will work
with Angela and Andrea to establish timelines for new intakes and their
TPR dates. I will complete them by the end of each month when they are
due. ... You will be given a list of the TPRs given to others to complete as
well as those for which I will be responsible. Jane and I can work to put it
on the K drive for future reference. ...

(FRO, Ex. 10 at ex. 41; IRB, Ex. A at ex. 12.)

On April 15, 2007, four days after Franks wrote the above response memorandum,

Franks called Robbins on her cell phone, office phone, and home phone to inform

Robbins of an Emergency Room visit that day and that Franks would have to go to her

doctor the next day, Monday, April 16, 2007.  (Doc. 39-1 ¶ 6; FRO, Ex. 10, ex. 43 at

bates 1122.)  The same day, after these phone calls from Franks, Robbins left a message

on Franks's home answering machine indicating that she would need to meet with Franks the next day, April 16, 2007.  (FRO, Ex. 1 ¶ 6; FRO, Ex. 1-B; FRO, Ex. 10, ex. 43 at bates 1122; IRB, Ex. C at 149-50.)  This meeting had not been scheduled before this time.  (Doc. 39-1 ¶ 6.)  On Monday, April 16, 2007, after attending her doctor's appointment, Franks went directly to Indian Rivers to inform them of her physical condition and request leave pursuant to the FMLA.  (Doc. 1 ¶ 18.)  Franks's request for FMLA leave was granted.

During the first few days of Franks's leave, Indian Rivers placed a number of telephone calls to Franks.  (*See*, *e.g.*, FRO, Ex. 10 at ex. 28.)  Franks returned a number of the phone calls from  Indian Rivers throughout her leave.  (*Id*.)  Indian Rivers contends that at no time did it call Franks to request that Franks come to work or to perform any work, and that Indian Rivers' employees were merely calling Franks to ask for work and FMLA leave related information.  (Doc. 34 at 10 (citing IRB, Ex. A at 220-21; IRB, Ex. C at 166.))  Franks, however, contends that the calls were about a crisis phone for an on-call that she had along with other employees, the location of files, work she needed to complete, and employee evaluations she needed to do immediately.  (Doc. 38 at 7-8 (citing FRO, Ex. 1 ¶ 7; *see* FRO, Ex. 1-B).)  On April 19, 2007, Franks wrote a memo to Robbins summarizing the calls from Indian Rivers since she started her leave.  (IRB, Ex. D at ex. 28; FRO, Ex. 1-B.)   In that memorandum, Franks discusses phone calls from Robbins regarding the location of certain files and also mentions work that she was asked to perform.  Specifically, Franks stated that

14

she "was reminded that the annual employee evaluations are due before the end of the month." (IRB, Ex. D at ex. 28; FRO, Ex. 1-B.)  She further stated that "I will be keeping up with the time I am working during my physician required medical leave as I will not be taking eight hours of leave time if I am doing work or following up on work for Indian Rivers."  (IRB, Ex. D at ex. 28; FRO, Ex. 1-B.)

On May 29, 2007, Harless sent a letter to Franks expressing concerns regarding her job performance and stating that they would need to discuss them upon her return.  (IRB, Ex. D at 142-43; FRO, Ex. 10 at ex. 10.)[4]  On June 13, 2007, Harless sent Franks another letter informing Franks that her "accrued leave, both sick and annual, was exhausted on June 8" and that the "remainder of your FMLA leave will be unpaid leave."  (FRO, Ex. 10 at ex. 6.) The letter also stated that "there are some critical issues we need to discuss with you immediately upon your return to the office"  and instructed Franks to report to Moore's office

---

[4]This letter stated in part:

> Recently we conducted mock reviews in preparation for our upcoming annual site visits by the state.  In doing so we identified a number of things that give me cause for concern regarding compliance issues.  For example, we noticed a high number of treatment plans with incomplete or irregular entries.  Also the Finance Department reported billing irregularities for some of the same issues.  As a result, we are examining a number of areas and we will need to talk to you immediately upon your return to work.

> . . .

> In order to preserve all relevant records and for your protection, we have suspended anyone from having access to your computer and office and any remote access to our records.

to discuss issues with her job performance when she arrived back to work on June 26, 2007. (*Id.*)

Indian Rivers contends that during Franks's FMLA leave, Robbins had found, among other things, many unsigned TPRs and employee leave requests that had not been acted on for months.   (Doc. 34 at 8 (citing FRO, Ex. C at 167, 169-70, & 190).)  Franks contends, however, that leave requests could only be turned in at certain times of the month due to policy and procedure from the payroll department and thus there would have been work in progress on Franks's desk, though not many unsigned TPRs.  (Doc. 38 at 8 (citing Ex. 1 ¶ 13).)

On May 29, 2007, while on FMLA leave, Franks had her computer access terminated. (FRO, Ex. 10, ex. 52 at bates 0357.)  A complete audit of Franks's patient files was also performed during her FMLA leave period and her on-call pay was removed from her paycheck.  (Doc. 39-1 ¶¶ 10 & 15)  Robbins did not conduct any audits of an employee's client files except Franks.  (FRO, Ex. 4 ¶ 5.)  When Franks returned to work on June 26, 2007, after receiving the full amount of FMLA leave she requested, (*see* IRB, Ex. A at 214), her office was locked and the lock had been changed. (Doc. 39-1 ¶¶ 10 & 15.)  Although Indian Rivers has a progressive disciplinary policy, (*see* FRO, Ex. 10 at ex. 24), no progressive disciplinary steps were taken by Indian Rivers prior to Franks's termination. (IRB, Ex. C at 262.)  Consistent with the letters from Harless, Franks was directed to Moore's office for a three hour meeting with Moore, Harless, and Robbins during which

meeting Franks's employment with Indian Rivers was terminated.[5]  (Doc. 39-1 ¶ 15; IRB,

Ex. A at 223; IRB, Ex. B at 180, 186-87, & 218; IRB, Ex. D at ex. 20.)

During the meeting of June 26, 2007 in which Franks was terminated, Moore told

Franks that she had performed her job ineffectively.  (IRB, Ex. A at 224; *see* IRB, Ex. B at

218.)  Moore reviewed a stack of TPRs with Franks and asked her to explain how she

allowed the mistakes contained therein.  (IRB, Ex. A at 224-25; IRB, Ex. B at 103-04, 210,

& 218.)  The very first TPR that Moore showed Franks stated "not billed" at the top of the

page; nevertheless, it appeared on Franks's billing records.  Franks explained that the TPR

has to be performed on each patient, but, if that patient has not been seen in 90 days, Indian

Rivers could not bill for performing the work.  Moore told Franks that he did not understand

this practice and procedure.  (FRO, Ex. 1 ¶ 16.)  Franks pointed out that the billing logs were

not in her handwriting, at which time Moore became frustrated that Franks was explaining

each and every one of his concerns and, as a result, Moore stopped the process.  (*Id.* ¶ 15.)

At the conclusion of the meeting, Moore terminated Franks's employment at Indian Rivers

for "repeated failure to complete assigned objective (i.e. treatment plan review process),

[and] Code of Conduct violation - No. 2; Submitting claim that represent services all or part

---

[5] Franks filed her Equal Employment Opportunity Commission ("EEOC") charge of
discrimination on June 22, 2007 (the "EEOC Charge").  (FRO, Ex. 10 at ex. 21.)  Counsel for
Franks faxed the letter of representation and the EEOC Charge to Indian Rivers' Office on June
25, 2007.  (FRO, Ex. 10, ex. 7 at 2; FRO, Ex. 10 at ex. 54.)  Indian Rivers knew Franks had filed
the EEOC Charge at the time it terminated her.  (FRO, Ex. 10, ex. 7 at 2; FRO, Ex. 10 at ex. 54.)
Indeed, Indian Rivers does not dispute this fact. (*See* doc. 43 at 2.)

of which simply were not performed."  (IRB, Ex. D, ex. 5 at bates 0051 & 0052; IRB, Ex. A at ex. 31; IRB, Ex. B at 257-58.)

Franks was aware that duplicate billing of TPR related treatment plans was prohibited. (IRB, Ex. A at 64.)  Indian Rivers contends that during April 2007, after Franks took FMLA leave, the Accounting Department advised Robbins that Franks had billed for an unusually large number of TPRs between March 28, 2007 and April 4, 2007.  (IRB, Ex. E.)  Indian Rivers contends that within the eight days between March 28, 2007 and April 4, 2007, Franks signed 613 TPRs, twenty of which were duplicates. (IRB, Ex. E.)  Indian Rivers did not produce documentary evidence that this in fact occurred.  Indian Rivers' contentions are also controverted by the testimony of Jones and Blackerby.  (*See* FRO Ex. 7 at 15-22 & 54-56; FRO, Ex. 8 at 80-84.)  Blackerby, Indian Rivers' employee responsible for accounting and billing to Medicaid, testified that she was unaware of any duplicate billing.  (FRO, Ex. 8 at 53.)  Blackerby also testified that she did not know how to generate a report on Franks's TPR activity, was not asked to produce such a report, and did not, in fact, produce such a report. (FRO, Ex. 8 at 54-55 & 80.)

There is evidence showing that the TPR, billing, and filing systems at Indian Rivers were less than perfect, and that Indian Rivers had knowledge of these defencies.  For instance, approximately two hundred TPRs went missing from the file department and had to be redone, and an additional three hundred fifty charts were identified as not assigned to anyone.  (FRO, Ex. 10, ex. 42 at 2; IRB, Ex. A at 151.)  Indian Rivers does not contend that

18

these deficiencies were caused by Franks.  Billing corrections and errors were a daily occurrence.  (FRO, Ex. 3 ¶ 5; IRB, Ex. B at 78-81.)

There is also evidence that Robbins has treated adversely other employees who have exercised FMLA rights. (FRO, Ex. 3; FRO, Ex. 4 ¶¶ 5-6.)  Robbins referred to employees who needed FMLA leave as "problem employees."  (Doc. 39-1 ¶ 12.)  Robbins had told Barbara Lowery, an Indian Rivers' employee, to put off surgery on two occasions and had denied Audra Hudson, also an Indian Rivers' employee, time off to care for her daughter and grandchild.  (FRO, Ex. 3; FRO, Ex. 6.)  Another Indian Rivers' employee, Bernice Kirkland, turned in her FMLA paperwork on October 7, 2008, and was terminated December 11, 2008.  (FRO, Ex. 10 at ex. 27.)  The same situation occurred when Jackie May turned in her FMLA leave paperwork; she was terminated a short time later.  (*Id.*)[6]

Before Franks went on FMLA leave in April 2007, she discovered that her health records had been accessed through a computer program called Meditech, which is a subscription service used by Indian Rivers.  (Doc. 39-1 ¶ 9; FRO, Ex. 10 at ex. 9.)  Franks suspected that her personal medical records had been accessed because of the calls she received from Indian Rivers inquiring about her medical condition during her FMLA leave period.  (FRO, Ex. 10 at ex. 28; Doc. 39-1 ¶ 9.)  Franks went to Druid City Hospital ("DCH") and discussed her concerns of unauthorized medical access with its privacy officer.  (Doc.

---

[6]The court is not ruling at this point on the admissibility at trial of the evidence stated in this paragraph.

39-1 ¶ 9.)  On October 27, 2005, Franks had asked Dr. Syed Aftab, a psychiatrist employed by Indian Rivers, to review lab results that she had not yet received from her physician. (Doc. 1-4.)  Dr. Aftab reviewed and gave Franks the results at her request.  Franks later discovered through her inquiry at DCH that Dr. Aftab had viewed her medical history on subsequent occasions between October 27, 2005 and November 4, 2005.  (Doc. 1-4.)  As a result, on May 14, 2007, Franks filed a Health Information Privacy Complaint with the Office of Civil Rights (the "OCR Complaint"), complaining that her private health information was viewed without her consent.[7]  (Doc. 1-4.)

Dr. Aftab testified that he had not discussed Franks's medical information with anyone.  (IRB, Ex. G.)  Franks testified that she does not have any proof that anyone other than Dr. Aftab accessed her medical information or that Dr. Aftab's viewing of her medical history was unrelated to her request of October 27, 2005. (IRB, Ex. A at 244-26.)   On June 10, 2008, approximately one year after Franks's employment at Indian Rivers was terminated, Franks filed her Complaint ("the Complaint") in the instant action.  (*See* doc. 1.) Indian Rivers filed its Answer to the Complaint on July 8, 2008.  (*See* doc. 4.)  On June 22,

---

[7] Indian Rivers contends that it did not receive a copy of the OCR Complaint until this lawsuit was filed on June 10, 2008.  (IRB, Ex. B at 204.)  Franks admitted that she did not send a copy of the OCR Complaint to Indian Rivers, has no proof that the OCR notified Indian Rivers of her claim prior to her termination, and has no proof that Indian Rivers was aware that she filed the OCR Complaint at the time of her termination.  (IRB, Ex. A at 232.)  Nonetheless, Franks contends that Harless testified that Moore showed her the OCR Complaint before she was terminated. (Doc. 38 at 9 (citing IRB, Ex. D at 135-26.))  Harless, however, testified later that she recalled Indian Rivers did not receive any complaint or notification of Franks's OCR claim until after her termination.  (Doc. 35-2 at 220-21.)

2010, Franks filed her Motion in Limine to Exclude Exhibits Summarizing Unproduced Evidence.  (*See* doc. 31.)

### III. DISCUSSION

**A. MOTION IN LIMINE TO EXCLUDE EXHIBITS, (doc. 31)**

In the Motion in Limine, Franks moves to exclude Defendant's Exhibit 13 and Plaintiff's Exhibits 30, 33, and 45, which were used in depositions to summarize TPRs completed by Franks, because Indian Rivers has not produced the documentation underlying the summary exhibits.  (Doc. 31.)  In response, Indian Rivers does not dispute that it has not produced all of the documentation that would support the summary exhibits.  (*See* doc. 32.) Instead, Indian Rivers contends that it produced 613 of the 721 TPRs summarized, which is the documentation that Indian Rivers could locate at the time it submitted its Initial and Supplemental disclosures.  (*Id.* at 2.)  Indian Rivers further contends that it does not rely on Defendant's Exhibit 13 and Plaintiff's Exhibits 30, 33, and 45 in its Motion for Summary Judgment and thus requests that the court defer ruling on the Motion in Limine until after the court has ruled on its Motion for Summary Judgment.  (*Id.*)

Federal Rule of Evidence 1006 provides, in relevant part, that the contents of voluminous writings, records, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  Fed. R. Evid. 1006. Once admitted, a Rule 1006 exhibit constitutes substantive evidence.  *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004).  The materials or documents on which

a Rule 1006 exhibit is based must be made available for "examination or copying," and though the underlying documents need not be admitted, they must nonetheless be admissible. *Id.* at 1159-60; Fed. R. Evid. 1006.  "In other words, Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible."  *Peat, Inc.*, 378 F.3d at 1160.

Here, Indian Rivers failed to produce all of the evidence underlying Defendant's Exhibit 13 and Plaintiff's Exhibits 30, 33, and 45.  The court cannot evaluate the admissibility of evidence not before it.  Therefore, Franks's Motion in Limine to Exclude Exhibits Summarizing Unproduced Evidence, (doc. 31), is due to be granted without prejudice to Indian Rivers' right to produce the underlying documents and file a motion in limine seeking admission of Defendant's Exhibit 13 and Plaintiff's Exhibits 30, 33, and 45.

## B. MOTION TO STRIKE PLAINTIFF'S AFFIDAVIT, (doc. 42)

In the Motion to Strike Plaintiff's Affidavit, Indian Rivers argues that Franks, "through her affidavit, attempted to create issues of material fact."  (Doc. 42.)  Specifically, Indian Rivers contends that the Affidavit of Terri Franks (the "Franks Affidavit") "contradicts her previous, clear testimony," (*id.* at 1-3), and "contains inadmissible hearsay." (*Id.* at 3-5.)  The court will address Indian Rivers' contradiction and inadmissible hearsay arguments separately.

## 1. Contradiction

In the Eleventh Circuit, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, the party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984); *see McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony.").  However, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." *Green v. Pittsburgh Plate & Glass Co.*, 224 F. Supp.2d 1348, 1362 (N.D. Ala. 2002)(citations omitted).  Therefore, the court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007)(quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986).

Indian Rivers contends that Franks attempted to create issues of material fact regarding the substance of the phone calls she received from Indian Rivers during her FMLA leave period.  (Doc. 42 at 1.)  In the EEOC Charge, Franks stated that "the substance of each

23

call concerned insignificant questions regarding my job duties." (Doc. 35-3 at 20.) The Complaint similarly states that "the substance of each call concerned insignificant questions regarding Plaintiff's job duties." (Doc. 1 at 6.) In her deposition, Franks stated that she went to Indian Rivers twice during her leave, once to complete some FMLA paperwork and once to meet with Robbins to discuss her surgery and expected return date. (Doc. 33, Ex. A at 220-21.) In the Franks Affidavit, however, Franks states that the "calls were about a crisis phone for on-call that I had along with other employees, a discussion I already had with another manager, location of files, work I needed to complete, and employee evaluations that I needed to do immediately." (Doc. 39-1 ¶ 7.) Indian Rivers contends this statement from the Franks Affidavit contradicts her prior testimony because she never stated in her deposition, the EEOC Charge, or the Complaint that she was asked to perform work on leave. The court disagrees.

The statements in the Franks Affidavit are corroborated by the memorandum Franks wrote to Robbins on April 19, 2007. In that memorandum, Franks discusses phone calls from Robbins regarding the location of certain files and also mentions work that she was asked to perform. Specifically, Franks stated that she "was reminded that the annual employee evaluations are due before the end of the month." (FRO, Ex. 1-B.) She further stated that "I will be keeping up with the time I am working during my physician required medical leave as I will not be taking eight hours of leave time if I am doing work or following up on work for Indian Rivers." (*Id.*) These statements, which were written during

24

Franks's FMLA leave, are consistent with the statements in the Franks Affidavit. Additionally, the deposition testimony cited by Indian Rivers in its motion to strike is not the entirety of Franks's testimony on the issue.  In her deposition, Franks also describes the phone calls made to her during FMLA leave as requesting information about the location of files and information about TPRs.  (IRB, Ex. A at 216-19.)

Furthermore, Indian Rivers' contradiction argument is not based on an inherent inconsistency between what Franks said in her Affidavit and what Franks said in the EEOC Charge, the Complaint, and her deposition; instead, its contradiction argument is based on what Franks did not say in the EEOC charge, the Complaint, and her deposition.  (*See* doc. 42)("Nowhere in the charge, which was written while Plaintiff was still on FMLA leave, does she state that she was asked to perform work on leave.")  Franks did not state in her deposition, the EEOC Charge, or the Complaint that the calls did *not* concern work or employee evaluations that she needed to complete.  Additionally, the phrase "insignificant questions regarding my job duties" could reasonably be interpreted by the trier of fact to refer to work that needed to be completed but that was not so important as to warrant a phone call during FMLA leave.  Therefore, Indian Rivers' Motion to Strike Plaintiff's Affidavit on contradiction grounds is due to be denied.

**2. Inadmissible Hearsay**

"Under Federal Rule of Civil Procedure 56(e), affidavits, supporting or opposing summary judgment, must be made on personal knowledge and must set forth facts that would

25

be admissible evidence." *McCaskill v. Ray*, 279 Fed. Appx. 913, 914-15 (11th Cir. 2008)

(citing *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999); Fed. R. Civ. P. 56(e)); *see*

*also* Fed. R. Civ. P. 56(c)(4).  "Hearsay is a statement, other than one made by the declarant

while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted."  Fed. R. Evid. 801(c).  Hearsay is inadmissible absent an exception. "[A] district

court may consider a hearsay statement in passing on a motion for summary judgment" only

if "the out-of-court statement made to the witness ... [would be] admissible at trial for some

purpose."  *Macuba,* 193 F.3d at 1323.

Indian Rivers contends that the following statements from Franks's Affidavit

constitute inadmissible hearsay: (1) "Employees began calling to tell me at home to tell me

my job was in jeopardy.  My employees were concerned I was going to be fired. I was told

that all of my patient records were being reviewed by Robbins and Harless," (doc. 39-1 ¶ 10);

(2) "Approximately three months after my termination from Indian Rivers I saw my primary

physician for a follow-up visit.  My physician told me that prior to my returning to work from

FMLA, Harless had contacted her [and] stated, 'we think Terri may be depressed and

paranoid' and that Harless wanted information on my medical treatment.  My physician

refused to share anything but felt I needed to know about the conversation," (*id.* ¶ 26); (3)

"[T]he emergency room physician told me it was imperative I see my private doctor the next

day," (*id.* ¶ 6); and (4) the statement of Chris Jones, privacy officer for DCH, "Yes, we have

had problems with her before."  (*Id.* ¶ 9.)  The court agrees with Indian Rivers.

These statements from the Franks Affidavit are hearsay pursuant to Fed. R. Evid. 802 because they are out of court declarations made by someone other than the declarant and are offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801. None of these statements fall within exceptions to the hearsay rule, and none are admissions by a party opponent. These statements are thus due to be stricken as inadmissible hearsay. Therefore, to the extent Indian Rivers' Motion to Strike Plaintiff's Affidavit, (doc. 42), is based on inadmissible hearsay, it is due to be granted.[8]

## C. MOTION FOR SUMMARY JUDGMENT, (doc. 34)

Indian Rivers contends that it is entitled to judgment as a matter of law "[b]ecause there are no genuine issues of material fact" and Franks "fails to state a claim against Defendant" under the FMLA and "fails to state a claim against Defendant under HIPAA...and for invasion of privacy." (Doc. 34.)

As set forth above, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

[8] Although the evidence before the court contains hearsay statements, other than those identified in Indian Rivers' Motion to Strike, these statements provoked no timely objection from either party and, therefore, are properly before the court on summary judgment. *See Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1016 (11th Cir. 1987)("[I]f evidence otherwise inadmissible provoked no timely objection, it could and, if material, should be factored into a summary judgment decision."); *Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1296 n. 17 (5th Cir. 1994)("The Contractors now contend that this paper is hearsay, and cannot be relied on by the district court in rendering summary judgment. However, they did not raise this hearsay objection below, so the error, if any, is waived.").

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the burden of proof at trial is on the nonmovant, this standard can be met either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the non-moving party's evidence itself is insufficient to establish an essential element of his or her claim. *Id.* at 322;  *see* Fed. R. Civ. P. 56(a) and (b).

### 1. FMLA

Generally, an employee may raise one of two basic types of FMLA claims:  one based on the employer's denial of or interference with the employee's substantive rights under the FMLA and the other based on the employer's discrimination or retaliation against the employee for engaging in activity under the FMLA.  The Eleventh Circuit has held:

> Among the substantive rights granted by the FMLA to eligible employees are the right to "12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and the right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position, 29 U.S.C. § 2614(a)(1).  To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims:  interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, see 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees . . . who have used FMLA leave.").

*Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001).

"To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Id.* at 1206-07 (citing *O'Connor,* 200 F.3d at 1353-54; *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999)).   "In contrast, to succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right."  *Id.* at 1207 (citing *King,* 166 F.3d at 891).   Franks alleges one cause of action, which consists of two claims, under the FMLA: (1) interference and (2) retaliation.  (*See* doc.1 ¶¶ 33-40.)

Franks's first interference theory of recovery is interference with the right to FMLA leave.  The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."  29 U.S.C. 2615(a)(1).   "'Interfering with' the exercise of an employee's rights ... include[s] ... not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. 825.220(b).[9]  The FMLA's "prohibition against 'interference'" also prohibits an employer from using "the taking of FMLA leave as a negative factor in employment actions...."  29 C.F.R. 825.220(c).  Franks asserts multiple grounds for her first FMLA interference claim.

---

[9]  Administrative interpretations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

First, Franks contends that Indian Rivers interfered with and discouraged her from using FMLA leave by asking her to postpone her leave requested in October of 2006 until after an audit by the Alabama Department of Mental Health and Mental Retardation. (Doc. 38 at 1, 11, & 20; doc. 39-1 ¶ 4.)  Indian Rivers contends that "[t]here is no merit to this argument" because Franks "did ultimately take her leave[,]... has presented no evidence that surgery was 'medically necessary' in October of 2006[,] ... does not allege that she sought the advice of her physician to overrule the Defendant's request[,] ... stated she herself had postponed the surgery for five years."  (Doc. 43 at 5 (internal citations omitted).)  The court agrees with Indian Rivers.

The FMLA provides that when leave is foreseeable due to planned medical treatment "the employee ... shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee...." 29 U.S.C. § 2612 (e)(2)(A).  The opening section of the FLMA highlights the interplay between the interests of the employee and the interests of the employer and makes clear that the purpose of the FMLA is "to entitle employees to take reasonable leave for medical reasons ... in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b).  The regulations promulgated by the Department of Labor further indicate that "[e]mployees are ordinarily expected to consult with their employers prior to the scheduling of treatment in order to work out a treatment schedule which best suits the needs of both the employer and the employee." 29 C.F.R. § 825.302(e); *see Kaylor v. Fannin Reg'l*

30

*Hosp., Inc.*, 946 F. Supp. 988, 998 (M.D. Ga. 1996)("The FMLA and subsequent regulations promulgated by the Department of Labor require the employee to consult with the employer when planning medical treatment."); *cf. LeBoeuf v. New York Univ. Med. Ctr.*, 2000 WL 1863762 (S.D. NY. 2000)(concluding that a supervisor's request that an employee postpone his FMLA leave in light of the a pending hospital audit and the busy holiday season did not support an inference that the reasons given for the employee's termination were pretextual).

No reasonable jury could find that Indian Rivers interfered with Franks's right to take FMLA leave by asking her to postpone her surgery.  Making arrangements with an employee to avoid unduly disrupting business by asking the employee to postpone FMLA leave in light of an upcoming audit is, as a matter of law, consistent with the purpose of the FMLA and does not give rise to a claim for interference.  What's more, Franks has not presented any evidence that her doctors objected to the postponement, that the requested postponement was meant to discourage her from taking leave, or that the postponement ultimately interfered with her FMLA leave.  Therefore, to the extent Franks's interference claim is based on Robbins's request that she postpone surgery, Indian Rivers is entitled to judgment as a matter of law.

Second, Franks contends that Indian Rivers interfered with her right to FMLA leave by removing the "on-call" pay she received for taking calls as part of the Crisis Response Team from her paycheck in "mid-May" 2007 during her FMLA leave.  (Doc. 1 ¶ 27; Doc.

39-1 ¶ 10.)  From April 16, 2007 through June 8, 2007, Franks was on paid FMLA leave.[10]

(*See* FRO, Ex. 10 at ex. 6).  Franks's on-call pay was terminated during the paid portion of

her FMLA leave.  (FRO, Ex. 1 ¶ 10.)  The Franks Affidavit states that "[i]t had never been

the practice of Indian Rivers to stop the on-call salary of any [crisis response] team member

on leave before it happened to me during FMLA leave."[11]  (Doc. 39-1 ¶ 12.)  The Franks

Affidavit further indicates that "if a [crisis response] team member need an extended period

of time off, the team either picked up the extra work week or we traded dates among

ourselves."  (*Id.*)  Indian Rivers does not dispute that Franks's on-call pay was terminated

during her FMLA leave.  (*See* doc. 43 at 5.)  Instead, Indian Rivers contends that summary

judgment is appropriate because "[t]he on-call pay is based on taking calls," and that

"[b]ecause the Plaintiff was on FMLA and not able to perform work, she was not paid for

on-call pay."  (*Id.*)

The issue is not, as Franks implies, whether it is the practice of Indian Rivers to stop

the on-call pay of Crisis Response Team Members during FMLA leave.  Rather, the issue is

whether the removal of *her* on-call pay constitutes FMLA interference. On the latter issue,

the court is of the opinion that an employer may deny an employee on-call pay during FMLA

---

[10] Franks exhausted her accrued leave as of June 8, 2007, and thus the remainder of her
leave was unpaid.  (FRO, Ex. 10 at ex. 6.)

[11]Although defendant does not move to strike this portion of Plaintiff's affidavit, the court
questions whether this information could be based on personal knowledge.  Nevertheless, for
purposes of the motion for summary judgment, the court will consider this evidence undisputed.

leave, where that pay is based on performance (i.e. taking calls) and where the employee is unable to so perform (i.e. take calls) due to FMLA leave, without interfering with the employee's rights under the FMLA. Although there is nothing addressing this precise issue in the FMLA or the Code of Federal Regulations as it relates to the FMLA, and no cases were cited addressing this issue, support for the court's holding is found by way of analogy in the Code of Federal Regulations as it relates to equivalent pay. 29 C.F.R. § 825.215(c)(2) provides that "if a bonus or other payment is based on the achievement of a specified goal such as hours worked, products sold or perfect attendance, and the employee has not met the goal due to FMLA leave, then the payment may be denied." Although 29 C.F.R. § 825.215(c)(2) concerns "[e]quivalent pay" upon return from FMLA leave, and although Franks's on-call pay was terminated during her FMLA leave, not upon her return from FMLA leave, the court considers that on-call pay is analogous to a production bonus, which, if based on performance, may be denied where the employee has not met the goal due to FMLA leave. Therefore, Indian Rivers is entitled to judgment as a matter of law on Franks's interference claim based on the removal of her on-call pay.

Third, Franks contends that Indian Rivers interfered with her FMLA leave by making "numerous phone calls" to her during her FMLA leave. (Doc. 1 ¶¶ 19-22 & 33-40.) The Franks Affidavit states that the "calls were about a crisis phone for on-call that I had along with other employees, a discussion I already had with another manager, location of files, work I needed to complete, and employee evaluations that I needed to do immediately."

(Doc. 39-1 ¶ 7; *see* FRO, Ex. 1-B.)  In response, Indian Rivers argues that these phone calls "concerned a call made by her ex-husband about their child and several calls about the location of files and the status of treatment plans for mentally ill patients" and that "none of the calls asked the Plaintiff to come to work or to perform any work."  (Doc. 35 at 17.) Notably, Indian Rivers did not argue, assuming Franks's version of the facts is correct, (*see* FRO, Ex. 1-B), that asking or requiring Franks to perform such work-related tasks during her FMLA leave does not constitute interference.  (*See* docs. 34 & 43.)  The court agrees with Indian Rivers that the phone calls, though allegedly made at inappropriate times, do not alone constitute interference.  Construing the facts in a light most favorable to Franks, however, the court finds that there is a genuine issue of material fact as to whether Indian Rivers interfered with Franks's right to FMLA leave by asking or requiring her to perform work-related tasks during her leave period.

Asking or requiring an employee to perform work during FMLA leave can constitute interference with that employee's FMLA rights.  *Cf. Sherman v. AI/FOCS, Inc.*, 113 F. Supp. 2d 65, 70-71 (D. Mass. 2000)("By essentially requiring Plaintiff to work while on leave ... Defendant has 'interfered' with Plaintiff's attempts to take leave....").  "[T]he ability to take FMLA leave is not conditioned upon the willingness of the employee to remain 'on call' to the employer.  Of the many prerequisites to FMLA leave, the convenience of the employer is not one."  *Id.* at 70.  For example, in *Arban v. West Publishing Corp.,* 345 F.3d 390 (6th Cir. 2003), the plaintiff was asked to perform work-related tasks while he was on medical

leave, and the court found that this interfered with his rights under the FMLA.  *Id.* at 402-05; *see McConnell v. Swifty Transp., Inc.*, 2005 WL 1865386, *8 (S.D. Ohio 2005)("[T]here is a genuine issue of fact about whether Stevens contacted McConnell to ask him if he would perform work-related tasks during the first two weeks of his FMLA leave").  Indian Rivers relies on *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524 (S.D.N.Y. 2009), and contends that the *Reilly* court "was faced with a situation identical to the one before this Court."  (Doc. 34 at 13.)

In *Reilly*, the employer asked the employee questions about work on numerous occasions during her pregnancy leave and subsequent hospital stay.  The employee was never asked to perform any work while on leave and received all of the leave to which she was entitled.  The employee argued that the telephone calls constituted "interference" with her right to leave, but the court disagreed. The court stated:

> Fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights. When limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments, employers do not violate the FMLA by making such calls.

*Reilly*, 620 F. Supp. 2d at 537.

Although the court is of the opinion that the *Reilly* court properly held that sufficiently cabined phone calls from an employer to an employee during the employee's FMLA leave do not constitute interference, *Reilly* is distinguishable from the case *sub judice*.  Here, unlike in *Reilly*, there is a genuine issue of material fact as to whether Indian Rivers asked or

required Franks to perform work during her FMLA leave period.[12]  (*See* doc. 39-1 ¶ 7; *see* FRO, Ex. 1-B.)

Franks's second interference theory of recovery is interference with the right to reinstatement.[13]  (Doc. 1 ¶¶ 33-40.)  The FMLA provides that "an employee returning from covered leave is entitled to be restored to his former position or its equivalent." *Strickland*, 239 F.3d at 1208; 29 U.S.C. § 2614(a)(1).  "An employer can deny the right to reinstatement, however, if it can demonstrate that it would have discharged the employee had he not been on FMLA leave."  *Strickland*, 239 F.3d at 1208 (citing *O'Connor*, 200 F.3d at 1354); 29 C.F.R. § 825.216(a)(interpreting 29 U.S.C. § 2614 so as to allow an employer to escape

---

[12]The court notes that at the time Plaintiff was apparently asked to perform employee evaluations, she had not been approved for FMLA leave.  In an April 27, 2007 letter from Rita Harless, defendant's Director of Human Resources, she notes that plaintiff's FMLA request has not yet been approved:

> Last week, when we spoke regarding your FMLA request, I stressed the importance of providing the documentation necessary to support your absences.  I offered to fax the certification paperwork directly to your doctor as this usually provides a quicker response, but you did not want me to.  You indicated that the leave commenced April 16, 2007, and that your doctor had given you an "off-work" excuse until May 1, 2007.  You have not provided me with that note.  Please understand that your absences to date are not approved until you provide the required documentation.  The FMLA forms must be returned to Human Resources prior to FMLA leave being approved.  (Ex. 10, ¶ 29.)

Thus, the time plaintiff was asked to perform work, she was arguably not on FMLA leave.

[13] The undisputed evidence shows that Franks was terminated immediately upon her return from FMLA leave.  Although Indian Rivers appears to argue that Franks was reinstated and then terminated, (*see* doc. 34 at n .2), Franks has presented evidence that during FMLA leave her computer access was terminated, her office was locked, and the lock on her office was changed.

liability under the FMLA on an interference claim if the employer can demonstrate that the employee who was denied reinstatement after FMLA leave would have been discharged even if he had not taken FMLA leave).  The reinstatement analysis tracks closely the FMLA retaliation analysis, and as discussed *infra*, there is a genuine issue of material fact as to whether Franks would have been terminated had she not taken FMLA leave.  Therefore, for the reasons stated below, summary judgment is inappropriate on Franks's interference claim based on the denial of her right to reinstatement.

Franks's second claim is retaliation.  Generally, a plaintiff may attempt to establish retaliation through the use of direct or circumstantial evidence.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Schoenfeld v. Babbit*, 168 F.3d 1257, 1266 (11th Cir. 1999)(acknowledging the availability of either direct or circumstantial evidence).  Allowing a plaintiff to establish retaliation or discrimination through the use of circumstantial evidence is significant because direct proof of discrimination is uncommon. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).  When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, courts apply the familiar burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), for evaluating Title VII discrimination claims.  *Strickland*, 239 F.3d at 1207; *see Dollar v. Shoney's, Inc.*, 981 F. Supp. 1417, 1419 (N.D. Ala 1997).  Under that framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation.  *Dollar*, 981 F. Supp at 1420 (citing

*Morgan v. Hilt*, 108 F.3d 1319, 1325 (10th Cir. 1997)); *see Combs*, 106 F.3d at 1527-28.  To

state a prima facie case for retaliation, "an employee must allege that: (1) he engaged in a

statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the

decision was causally related to the protected activity." *Strickland*, 239 F.3d at 1207 (citing

*Parris v. Miami Herald Publ'g Co.,* 216 F.3d 1298, 1301 (11th Cir. 2000)).

If a prima facie case of retaliation has been established, thereby giving rise to a

presumption of unlawful, disparate treatment, the burden of production shifts to the

defendant to rebut the presumption of retaliation by articulating legitimate, nondiscriminatory

reasons for the contested employment action.  *Combs*, 106 F.3d at 1528 (citing *McDonnell*

*Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).  The defendant need not persuade the

court that it was actually motivated by the proffered reasons.  It is sufficient if the

defendant's evidence raises a genuine issue of fact as to whether it retaliated against the

plaintiff.  *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55 (citation and

footnote omitted)).  "[T]he employer need only produce admissible evidence which would

allow the trier of fact rationally to conclude that the employment decision had *not* been

motivated by discriminatory animus."  *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S.

at 257).

If the defendant successfully articulates legitimate, nondiscriminatory reasons for the

contested employment action, the burden shifts back to the plaintiff to show that defendant's

stated reasons are merely pretexts for unlawful, discriminatory motives. *Combs*, 106 F.3d at

1528 (citing *Burdine*, 450 U.S. at 256).  As explained by the Supreme Court:

> [The plaintiff] now must have the opportunity to demonstrate that the
> proffered reason was not the true reason for the employment decision  . . .
> [The plaintiff] may succeed in this either directly by persuading the court that
> a discriminatory reason more likely motivated the employer or indirectly by
> showing that the employer's proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256.  In other words, a plaintiff may defeat a summary judgment by

producing sufficient evidence, including the evidence previously produced establishing the

prima facie case, to allow a rational trier of fact to disbelieve the employer's proffered

legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of

unlawful discrimination.  *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256;

*McDonnell Douglas*, 411 U.S. at 804)*; see also Reeves v. Sanderson Plumbing Products,*

*Inc.*, 530 U.S. 133, 148-49 (2000).  To accomplish this, a plaintiff may point to "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered

reason.  *Diaz v. Transatlantic Bank*, 367 Fed. Appx. 93, 97 (11th Cir. 2010)(quoting *Brooks,*

446 F.3d at 1163 (citation omitted)).  However, a plaintiff cannot merely quarrel with the

wisdom of the employer's reason, but "must meet the reason head on and rebut it."  *Diaz*, 367

Fed. Appx at 97 (quoting *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000)

(en banc)).

It is undisputed that Franks engaged in statutorily protected activity by requesting and

taking FMLA leave.  (*See* docs. 34 & 43.)  Therefore, the first element of the prima facie

case is satisfied.  As to the second element, Franks has plausibly raised three potentially adverse employment actions: the change in her workload and in Robbins's attitude towards her after she informed Robbins of her need to take FMLA leave; the letters she received from Harless during her FMLA leave; and her termination upon return from FMLA leave.  (*See* doc. 1.)  The court will address each action separately.

In the opinion of the court, the increase in Franks's responsibilities and the alleged change in Robbins's attitude towards plaintiff following her request for FMLA leave in October 2006 do not constitute adverse employment action.  In *Davis*, the Eleventh Circuit observed, in a Title VII case, that in the majority of instances, "a change in work assignments, without any tangible harm" does not constitute adverse employment action, "especially where ... the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification."  *Davis*, 245 F.2d at 1245. "Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing ... priorities.  *Id.* at 1244.  Here, after Franks informed Robbins of her need for surgery, Franks's TPR responsibilities increased from eight hundred to nine hundred to approximately five thousand, Franks was required to engage in various other managerial and training activities, and Robbins became openly irritated with Franks.  Under *Davis*, these actions lack the requisite materiality to constitute adverse employment action.

The three letters Franks received from Harless during her FMLA leave citing job performance issues also do not constitute adverse employment action.  In *Hawkins v. Potter*, 316 Fed. Appx. 957 (11th Cir. 2009), the Eleventh Circuit held that an employee's receipt of three letters from his employer citing past performance problems did not constitute adverse employment action.  *Id.* at 961 (citing *Davis*, 245 F.3d at 1239).  In *Howard v. Walgreen Co. d/b/a Walgreens Pharmacy*, 605 F.3d 1239 (11th Cir. 2010), the court found that merely telling an employee that his job was in jeopardy after he complained about "discrimination" did not reasonably amount to adverse employment action.  *Id.* at 1245; *see also Davis*, 245 F.3d at 1240 ("We do not view either of the job performance memoranda as constituting adverse employment action").  Franks has failed to establish that the letters had any impact on the "terms, conditions, or privileges" of her employment in a "real and demonstrable way."  *Hawkins*, 316 Fed. Appx. at 961.  Therefore, the court finds that the letters from Harless do not constitute adverse employment action.

Though none of the pre-termination actions taken by Indian Rivers constitute adverse employment actions, the termination of Franks's employment upon her return from FMLA leave certainly does.  "Termination is an adverse employment action."  *McCray v. Wal-Mart Stores, Inc.*, 377 Fed. Appx. 921, 923 (11th Cir. 2010) (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)); *see Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  Indeed, Indian Rivers does not dispute this.  (*See* docs. 35 & 43.)

41

Therefore, on this ground, the court finds that the second element of the prima facie case is satisfied.

While Indian Rivers does not generally dispute that the first two elements of the prima facie case are satisfied, it does, though not in certain terms, contend that its decision to terminate Franks was not causally related to her exercise of FMLA rights. (Doc. 34 at 16-21; doc. 43 at 4-9.) "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). The Eleventh Circuit construes the causal link element broadly. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Close temporal proximity between the protected conduct and the adverse employment action can indicate causation. *See Brunghart v. Bellsouth Telecomm. Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (citing *Bechtel Constr. Co. v. Secretary of Labor*, 50 F.3d 926, 934 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of causation.")). In *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001), the Supreme Court recognized that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Id.* at 273. In this case, the temporal proximity is "very close." *See Martin v. Brevard Cty. Pub. Schools*, 543

42

F.3d 1261, 1268 (11th Cir. 2008) ("[T]he close temporal proximity between the two - Martin was terminated while on FMLA leave - is more than sufficient to create a genuine issue of material fact of causal connection."). Franks was terminated the day she returned to Indian Rivers from FMLA leave.  This case is thus unlike other cases where a substantial delay between the protected expression and the adverse action alone was not enough to establish causation.  *See*, *e.g.*, *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that "in the absence of any other evidence of causation," a three month proximity "between a protected activity and an adverse employment action is insufficient to create a jury issue on causation"); *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (holding that, by itself, three and one-half months was insufficient to prove causation).  In this case the "very close" temporal proximity is alone sufficient to satisfy the causal link element. Even assuming, however, that the close temporal proximity alone is insufficient to establish causation, the close temporal proximity in this case is buttressed by other evidence indicating causation.  *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). The close temporal proximity, combined with the circumstances surrounding Franks's termination, which are described in detail below, present a triable issue as to whether there is a causal connection between Franks's FMLA leave and her termination.

Indian Rivers terminated Franks for two reasons: "[R]epeated failure to complete assigned objective (i.e. treatment plan review process), [and] Code of Conduct violation - No. 2; Submitting claim that represent services all or part of which simply were not

performed." Franks was responsible for implementing a system for monitoring TPRs, knew the importance of conducting TPRs, and was ultimately responsible for completing TPRs. Indian Rivers has produced evidence that Franks was terminated for repeatedly failing to develop a process for competing TPRs and for her serious errors in completing TPRs. For instance, while Franks was on leave, Indian Rivers discovered many unsigned TPRs on Franks's desk and also allegedly learned that Franks had billed for an unusually large number of TPRs between March 28, 2007 and April 4, 2007, some of which were allegedly duplicates. (*See* IRB, Ex. E.) Therefore, the court finds that Indian Rivers has produced sufficient admissible evidence to allow the trier of fact to rationally conclude that its decision to terminate Franks was legitimate, not retaliatory, and to shift the burden back to Franks to show that these stated reasons were pretextual.

In alleging that Indian Rivers' articulated reasons for her termination were pretextual, Franks emphasizes that Indian Rivers deviated from its progressive disciplinary policy, and that Indian Rivers's explanation for Franks's termination is a cover-up. (Doc. 38 at 26-29.) First, there is a genuine issue of material fact as to whether Indian Rivers' deviation from its progressive disciplinary policy was warranted. An employer's deviation from its own standard procedures may serve as evidence of pretext. *Hurlbert*, 439 F.3d at 1299; *accord Rudin v. Lincoln Land Community Coll,* 420 F.3d 712, 727 (7th Cir. 2005)("An employer's failure to follow its own internal employment procedures can constitute evidence of pretext."). Indian Rivers relies on *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236 (11th

Cir. 2010), and contends that in *Schaaf* "the Eleventh Circuit was presented with a nearly identical situation to the instant case." (Doc. 35 at 16.)  *Schaaf*, however, is distinguishable. In *Schaff*, the court stated:

> [A]lthough evidence that GSK deviated from its ordinary disciplinary procedures may have caused a jury to entertain the possibility of an alternate explanation for Schaff's demotion, *Schaff offered no evidence that would have a allowed a jury to find that there was such an alternate explanation*. Schaff did not present any evidence suggesting that GSK was motivated by a discriminatory animus, nor did she offer any evidence showing that GSK's reasons were bad ones - that is, she did not argue that she was not an aggressive, insensitive leader with poor communication skills.

602 F.3d at 1244 (emphasis added).

Unlike the employee in *Schaaf*, Franks has presented substantial evidence to raise a genuine issue of material fact as to whether Indian Rivers' stated reasons for her termination (i.e. fraudulent billing and mistakes related to TPRs and the TPR review process) were false or more likely motivated by a discriminatory animus.  Franks denied (and continues to deny) that she committed the TPR mistakes attributed to her.[14]  After Franks was promoted to AOP Manager and worked under Robbins for a year, Robbins scored Franks higher than the year before on her yearly evaluation in November 2006.  Robbins neither recorded nor indicated in any fashion that she had any issue with Franks TPR performance or Frank's implementation of a TPR review system on Franks's yearly evaluation in November 2006. Moreover, as late as March 2007, Robbins openly praised Franks for her work in updating

---

[14]Plaintiff's denial alone would not create a question of fact.

45

patient files, identifying Medicaid patients, completing all Medicaid TPRs, and assigning treatment tracks.  Franks has also negated Indian Rivers' accusation that her mistakes in completing TPRs and implementing a TPR review process caused a forty thousand dollar ($40,000.00) payback to Medicaid.  Indian Rivers has not produced ***any*** evidence to support its allegation of such a Medicaid payback. And, in fact, the very people (Jones and Blackerby) that Robbins claims advised her that Franks caused a forty thousand dollar ($40,000.00) payback to Medicaid, testified that they did not advise Robbins or anyone else at Indian Rivers of such a Medicaid payback.  The lack of evidence to support Indian Rivers' Medicaid payback allegation is, in and of itself, evidence of pretext.

Furthermore, Franks has presented evidence showing that Indian Rivers had knowledge that mistakes in completing TPRs are a common occurrence because of missing files, notes, and other factors beyond the control of the person completing the TPR.  In this regard, the situation in the AOP closely resembles that found in *Sherman v. AI/FOCS, Inc.*, 113 F. Supp. 2d 65 (D. Mass. 2000), which is persuasive. *See id.* at 71-72 (finding an employer's termination of an employee because of, *inter alia*,  poor job performance, including failing to pay vendor invoices, and lost invoices unconvincing in light of evidence that the employer knew the disarray in the employee's department could not be attributed to her).  Here, like in *Sherman*, there is substantial evidence from which a reasonable jury could find that Franks's failure to implement an effective TPR monitoring system and to complete TPRs, if such failures did in fact occur, were not Franks's fault.  Although Franks knew the

importance of TPRs and was ultimately responsible for completing TPRs, there is substantial probative evidence before the court showing that Indian Rivers *had knowledge* that the TPR, billing, and filing systems at Indian Rivers were in disarray, and that this disarray was not attributable to Franks.  This knowledge, along with the other evidence outlined above, demonstrates "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Indian Rivers' proffered reasons for Franks's termination. *Combs*, 106 F.3d at 1538.

Second, there is substantial evidence from which a rational trier of fact could find that Indian Rivers' stated reasons for Franks's termination were a cover-up for discrimination and thus pretextual.  Indian Rivers terminated Franks the day she returned from FMLA leave and four days after she filed her EEOC Complaint .  *See*, *e.g.*, *Hurlbert*, 439 F.3d at 1298 ("The close temporal proximity between Hurlbert's request for leave and his termination - no more than two weeks, under the broadest reading of the facts - is evidence of pretext...."); *Medina v. Income Support Div., New Mexico,* 413 F.3d 1131, 1138 (10th Cir. 2005)("While we 'have stated that close temporal proximity is a factor in showing pretext, [it] is not alone sufficient to defeat summary judgment.'").  Indian Rivers contends that, in light up an upcoming site visit from the Department of Mental Health and Mental Retardation, it conducted an audit of Franks's files while she was on FMLA leave.  Indian Rivers, however, did not audit the files of anyone other than Franks.  The lone audit of Franks's files is evidence of pretext because it is reasonable to infer that had Indian Rivers truly been concerned with the

upcoming audit, it would not have confined its inquiry solely to Franks's files.  Moreover, during the audit, Indian Rivers was allegedly advised that Franks had billed for an unusually large number of TPRs, some of which were allegedly duplicates.  Jones and Blackerby, however, testified that they do not know how to prepare such a report on an employee's TPR activity or billing.  Indian Rivers has not outlined any undisputed facts to show that, prior to Franks's termination, it knew Franks engaged in duplicate or fraudulent billing.  The testimony of Jones and Blackerby indicating that they did not advise Indian Rivers that Franks billed for an unusually large number of TPRs, gives rise to a genuine issue of material fact regarding whether Franks actually billed for an unusually large number of TPRs or billed for duplicate TPRs.

Finally, there is evidence that Robbins treated adversely other employees who had exercised rights under the FMLA.  *See*, *e.g.*, *Principe v. Seacoast Banking Corp. of Florida*, 2010 WL 2976766, *3 (S.D. Fla July 20, 2010) (holding that, to the extent a plaintiff seeks prove FMLA retaliation by circumstantial evidence, FMLA leave taken by other employees and the treatment of those employees is relevant to the employer's pattern or practice of dealing with employees who exercise, or attempt to exercise, their FMLA rights); *cf. Thompson v. Chase Bankcard Servs., Inc.*, 2010 WL 3365913, *13 (S.D. Ohio Aug. 23, 2010) (considering evidence that "other employees, specifically non-FMLA employees, were treated differently" than FMLA employees as evidence of pretext).  Indian Rivers has neither sought to rebut nor clarify any of this evidence, which goes beyond simply quarreling with

the wisdom of the reasons proffered by Indian Rivers. Accordingly, the court concludes a rational trier of fact could find that Indian Rivers stated reasons for Franks's termination were pretextual.   Therefore, Indian Rivers Motion for Summary Judgment on Franks's retaliation claim is due to be denied.

## 2. HIPPA Violation / Invasion Of Privacy

In *Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705 (Ala. 1983), the Alabama Supreme Court explained:

> It is generally accepted that the invasion of privacy tort consists of four distinct wrongs: 1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use.  *Norris v. Moskin Stores, Inc.,* 272 Ala. 174, 132 So.2d 321 (Ala. 1961).

*Phillips*, 435 So. 2d at 708.  Franks's invasion of privacy claim "is based on her knowledge that her private medical information was accessed unlawfully by Indian Rivers and Connie Robbins."[15]  (Doc. 38 at 29-31.)  The Complaint does not clearly state which wrong Indian

---

[15] Franks's HIPPA claim was not briefed or argued in opposition to Indian Rivers' Motion for Summary Judgment.  (*See* doc. 38.)  Therefore, the claim is abandoned.  *See, e.g., Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1326 (11th Cir. 2000) (holding that a failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (finding that grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned).

Rivers allegedly committed, but the court is of the opinion, based on a review of the Complaint, that Franks is proceeding under the first two prongs stated in *Phillips.*

First, one wrongfully intrudes into the physical solitude or seclusion of another when he or she "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person." *Johnston v. Fuller*, 706 So. 2d 700, 702 (quoting *Restatement (Second) of Torts* § 6528 (1977)).  On October 27, 2005, Franks asked Dr. Aftab to access her medical information to view lab results that she had not yet received from her physician.  Franks alleges that Dr. Aftab thereafter accessed her health information, without consent, on November 1, 2005 and November 4, 2005.  Franks, however, has not presented any evidence to show that Dr. Aftab's accessing her medical records on November 1, 2005 and November 4, 2005 was unrelated to her request of October 27, 2005.  Although Franks has presented evidence that Robbins has a history of accessing employee medical records and using those records to make employment decisions, Franks has no evidence that anyone other than Dr. Aftab viewed her medical records.  Franks's suspicions are not sufficient to withstand summary judgment.  Therefore, Indian Rivers's Motion for Summary Judgment is due to be granted on Franks's invasion of privacy claim based on intrusion.

Second, the Alabama Supreme Court has explained:

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that

(a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public.

*Johnston*, 706 So. 2d at 703 (quoting *Restatement (Second) of Torts* § 652D).  "Publicity"

means that:

> the matter is made public, by communicating it to the public at large, or to so
> many persons that the matter must be regarded as substantially certain to
> become one of public knowledge.... Thus, it is not an invasion of the right of
> privacy, within the rule stated in this Section, to communicate a fact
> concerning the plaintiff's private life to a single person or even to a small
> group of persons.

*Id.* (quoting *Restatement (Second) of Torts* § 652D cmt. a (1977)).

Like her intrusion claim, Franks's publicity claim also fails.  Franks has not presented

any evidence from which a rational trier of fact could find that Dr. Aftab shared her medical

information with anyone. Franks does not allege that her health information was made public

by Dr. Aftab or any other agent or employee of Indian Rivers.  Therefore, the Motion for

Summary Judgment filed by Indian Rivers is due to be granted on Franks's invasion of

privacy claim based on publicity.

Even assuming Franks has stated an invasion of privacy claim sufficient to withstand

summary judgment, the claim is barred by the statute of limitations.  (Doc. 38 at 29-31.)  The

statute of limitations for a claim of invasion of privacy is two years.  Ala. Code § 6-2-38 (*l*)

(1975).  Franks's cause of action accrued, at the latest, on November 4, 2005, the last date

on which Dr. Aftab viewed her medical records. *See Nelson v. Estate of Frederick*, 855 So.

2d 1043, 1047 (Ala. 2003)("A cause of action accrues when a party suffers an injury or a loss or damage entitling him or her to maintain an action."). Consequently, the applicable two year limitations period expired on November 4, 2007. Franks did not file the Complaint until June 10, 2008. (Doc. 1.) Therefore, Indian Rivers Motion for Summary Judgment on Franks's invasion of privacy claim is due to be granted.

## CONCLUSION

For the foregoing reasons, Franks's Motion in Limine to Exclude Exhibits Summarizing Unproduced Evidence, (doc. 31), is due to be granted, Indian Rivers' Motion to Strike Plaintiff's Affidavit, (doc. 42), is due to be granted in part and denied in part, and Indian Rivers' Motion for Summary Judgment, (doc. 34), is due to be granted in part and denied in part. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this 30th day of September, 2012.

*Sharon Lovelace Blackburn*

_____

SHARON LOVELACE BLACKBURN

CHIEF UNITED STATES DISTRICT JUDGE